IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE AMTRAK TRAIN DERAILMENT | : | MDL NO. 2654 |
| IN PHILADELPHIA, PENNSYLVANIA | : | |
| ON MAY 12, 2015 | : | 15-md-2654 |

MEMORANDUM

Legrome D. Davis, J.                                                    July 31, 2017

On May 12, 2015, Amtrak Train 188 derailed with 245 passengers aboard near the

Frankford Junction in Philadelphia, Pennsylvania.  The train was traveling in excess of 100 miles

per hour as it approached a curve in the track subject to a speed limit of 50 miles per hour.  Eight

passengers lost their lives.  Many were catastrophically or seriously injured.  Many claims ensued

from the derailment.  Amtrak accepted liability for compensatory damages.  However, Amtrak's

liability cannot exceed the $295 million statutory limit that may be paid for the awards to all rail

passengers arising from a single accident.  On October 27, 2016, the Court approved a global

resolution establishing a Settlement Program, which was negotiated by Amtrak and the Plaintiffs'

Management Committee.  Case Mgmt. Order ("CMO"), entered Nov. 3, 2016 (ECF 145).  All

claims are now resolved, and the settlement funds have been paid to Plaintiffs—all within 22

months of creation of this MDL.  In part, this was achieved because 100% of the Plaintiffs

participated in the Program.  Moreover, four-tenths of one percent (0.00418 %) of the Program's

Settlement Fund was spent on administration.  Careful evaluation and use of options for

investment of the settlement funds earned $570,214.64 extra for Plaintiffs.

Mindful of the duty to act as a fiduciary guarding the rights of all claimants against the

funds afforded by Amtrak's limited liability, this memorandum explains how and why the

Settlement Program met its foremost goals—the equal treatment of all claimants and a timely

disposition consistent with critical aspects of the true nature of each case in the MDL.

On October 13, 2015, under 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation transferred actions pending in multiple districts[1] for coordinated and consolidated pretrial proceedings with actions pending in the Eastern District of Pennsylvania.  The Judicial Panel assigned the MDL to this Court.  All of the actions asserted claims for personal injury or wrongful death arising from the derailment of Amtrak Train 188.  All asserted that Amtrak was negligent in its operation of the train and was at fault for not equipping the train with "Positive Train Control," which would have prevented the train from exceeding the speed limit.  Centralized pretrial proceedings in fact produced efficiency and cost benefits for the parties and the courts.

The Settlement Program established a $265 million Settlement Fund—the present value of the statutory maximum limit of Amtrak's liability[2]—for awards of compensatory damages and court-approved administrative fees and expenses.  CMO ¶¶ 1, 5, 9-10 (litigants electing to participate in the Program are "Participating Plaintiffs").  In total, there were 299 claimants of which 159 claimants elected to participate in the Program.  The other claimants separately settled with Amtrak or withdrew their claim, or acknowledged that they were not injured, and two did not respond to Amtrak's repeated efforts to contact them. [3]

---

[1]  Ultimately, the Judicial Panel transferred actions from seven districts, including the Eastern and Southern Districts of New York; District of New Jersey; District of Maryland; District of Columbia; District of Connecticut, and Southern District of Texas.

[2]  The statute prescribes a maximum limit for the "aggregate allowable awards to all rail passengers, against all defendants, for all claims, including claims for punitive damages, arising from a single accident or incident."  Amtrak Reform and Accountability Act of 1997, Pub. L. No. 105-134, 111 Stat. 2570, codified at 49 U.S.C. § 28103.  At the time of the derailment, the prescribed limit was $200 million. 49 U.S.C. § 28103(a)(2) (2015).  On December 4, 2015, President Obama signed the Fixing America's Surface Transportation Act ("FAST Act"), Pub. L. 114-94, 129 Stat. 1312, which increased the limit to $295 million specifically as to this derailment.  Id., Pub. L. 114-94 § 11415, 129 Stat. 1312, 1689.

[3]  "Claim" and "claimant" mean, respectively, the contentions of a person arising from the derailment. The 299 total claimants comprise 245 passengers and 52 of their spouses who asserted loss of consortium. Whereas Derrick Caesar asserted that he was a passenger, and his wife asserted loss of consortium, it turned out that he was not in fact a passenger.  Neither Caesar nor his wife received awards.  Of the 297 legitimate claimants, 84 settled with Amtrak without filing a legal action, and 46 litigants settled with Amtrak before January 31, 2017, the bar-date for participation in the Settlement Program, see CMO ¶¶ 7-8.  Of the litigants, 159 elected to participate in the Settlement Program.  In addition, two state court

The Court has considered the deaths and injuries suffered by the passengers, and the losses suffered by their families.  The Court has done so with heightened awareness and acute regret that when bodily harm or mental distress is caused by a tort, the law cannot restore the injured person to his or her previous position.  A "sum of money is not equivalent to peace of mind," or a sound body, or a lost loved one.  Restatement (Second) of Torts § 903 (1979).  The law can provide "only a very rough correspondence between the amount awarded as damages and the extent of the suffering."  Id.  We can only strive for fairness and consistency.  In fact, the diligent and skillful efforts of all participants in this MDL have had a collective impact for the good of all claimants that far exceeds the individual contributions of a truly outstanding group of attorneys, professionals, and litigants.

I.    CASE MANAGEMENT OF THE MDL

    A.    Principles of Case Management

    The movement of a case through the court system can be managed, and this is true with MDLs as well as two party cases.  "The fundamental judicial management goals for cases transferred into an MDL proceeding should largely mirror those in any civil action—to manage discovery and otherwise efficiently prepare the cases for trial, taking care to identify pretrial opportunities to resolve key issues or to achieve settlement."  Duke Law School, Center for Judicial Studies, Standards and Best Practices for Large and Mass–Tort MDLS (Dec. 19, 2014)[4] (hereafter, "MDL Best Practices"), at 1.

---

lawsuits that were added to the MDL docket had already settled *en route* the administrative transfer process.  One spouse withdrew her claim for loss of consortium.  Three passengers signed statements that they were not injured.  Only two passengers, residents of India, did not respond to Amtrak's repeated efforts to engage their participation in the Settlement Program.

[4]

https://law.duke.edu/sites/default/files/centers/judicialstudies/standards_and_best_practices_for_large_and_mass-tort_mdls.pdf

As widely and long recognized, "caseflow management" entails "supervision or management of the time and events involved in the movement of a case through the court system from the point of initiation to disposition, regardless of the type of disposition."  Maureen Solomon & Douglas K. Somerlot, Caseflow Management in the Trial Court, Now and for the Future at 3 (American Bar Association 1998) (hereafter, "Caseflow").  "Emphasis is placed on the word management.  As the verb 'to manage' denotes action, the term 'caseflow management' contemplates active oversight by the court of the progress of all cases filed."  Id.  "A well-designed caseflow management system virtually assures that each case will receive the type and amount of court attention required by its nature and complexity."  Id. at 4.  This approach is consonant with the Federal Rules of Civil Procedure, which authorize a court to consider and take appropriate action by "adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems," and by "facilitating in other ways the just, speedy, and inexpensive disposition of the action."  Fed. R. Civ. P. 16(c)(2)(L), 16(c)(2)(P).

The first crucial task of the court, as a manager, is to figure out the true nature of the case presented, and to do this as early as possible.  Caseflow at 3.  By fully taking into consideration the critical aspects of the case's true nature, effective methods, techniques, and practices for processing that case can then be crafted.  Simply put, if the judge knows and understands what is presented for decision, and identifies what the case actually needs, a management structure responsive to those needs can be created.  And this is the essence of case management—to make cases flow through the court system consistent with their true processing requirements.

Every MDL "remains unique and different," and no set of case management techniques or a "single practice is right for every MDL."  MDL Best Practices, at ii, iv, 31-32.  Instead,

"transferee judges and lawyers must craft individual solutions to the unique challenges each MDL presents." Id. at ii. In doing so, the court's objectives are to ensure (1) "equal treatment of all litigants by the court," (2) "timely disposition consistent with the circumstances of the individual case," (3) "enhancement of the quality of the litigation process," and (4) "public confidence in the court as an institution." Caseflow at 5. In order to achieve these goals, a court's management must incorporate certain fundamental elements, of which the following proved to be especially important for the fair and efficient processing of this MDL.

The first element is judicial commitment and leadership. Caseflow at 7. The judge sets the tone for the proceedings. Id. "Judicial commitment to the concept of court responsibility for the pace of litigation" is "a primary element of effective caseflow systems." Id. at 8. But judicial commitment alone is not enough to achieve effective case management and minimize delay. Id. at 8-9. "Leadership by a key judge or judges is needed to initiate changes or improvements." Id. at 9.

Court consultation and open dialogue with the bar is also a crucial element. Caseflow at 7. "Development and maintenance of an orderly, predictable, and effective caseflow management system that minimizes delay is of mutual concern to the court and bar." Id at 7. "While final responsibility for development and operation rests with the court, the bar should be an active participant in development and evaluation of the caseflow system." Id. "Teamwork as a component of commitment extends to the court's relationship with the organized bar." Id. at 10. "Dialogue rather than reaction is crucial." Id. at 11. "Not only are bright, interested lawyers able and willing to serve" a resource for the planning process, "but they bring a perspective to the planning process that is unique to the role they play in the justice system." Id. And the

participation of dissenters and critics aids development of the best system.  "Often they highlight potential pitfalls that the court can avoid by heeding their warnings."  Id.

Court supervision of case progress, an additional element, "is the foundation of effective caseflow management."  Caseflow at 11.  "The court, in consultation with the attorneys in each case, should play an active role in determining the timetable which will govern all proceedings during the life of each case."  Id. at 8.  Court supervision of case progress should involve "direct consultation with the lawyers in the case and tailoring a disposition track and timetable to the characteristics of each case."  Id. at 12.  Importantly, '[e]arly agreement on a timetable builds attorney commitment to the deadlines."  Id. at 14.  This foundational element "flows logically from the philosophy that the court is responsible for assuring timely disposition and equality of access to court processes for all cases."  Id. at 12.  "Only through early and continuous oversight of case progress can this responsibility be discharged effectively."  Id.

Furthermore, the creation of standards and goals governing case disposition is an important element of good caseflow management:

> The transferee court, in consultation with the parties, should articulate clear objectives for the MDL proceeding and a plan for pursuing them.  The objectives of an MDL proceeding should usually include:  (1) the elimination of duplicative discovery;  (2) avoiding conflicting rulings and schedules among courts;  (3) reducing litigation costs; (4) saving the time and effort of the parties, attorneys, witnesses, and courts; (5) streamlining key issues, and (6) moving cases toward resolution (by trial, motion practice, or settlement).

MDL Best Practices at 2-3.  "The ultimate burden of articulating goals and plans will reside with the transferee judge, taking account of counsels' ideas and adding some of [the judge's] own."  Id. at 3.  See also Caseflow at 8, 23 ("Standards and goals define the direction of the caseflow management system.").

Goals and standards are "best achieved through consultation with the bar."  Caseflow at 19.  "The dialogue will apply the judgment of the court and counsel on the time needed to

complete the activities in question." Id. "Once adopted, time standards serve important operational purposes in addition to defining the outer limits of delay." Id. at 17. They provide a basis for measuring the effectiveness of the court's caseflow management system." Id. "Overall time standards provide a basis for case progress decisions in the management of individual cases." Id. Through application of standards and goals, "court supervision of case progress becomes a reality." Id. at 19. By the court's monitoring to assure that intermediate events occur as scheduled, and goals and standards are met, orderly progress toward the conclusion of the case is nurtured, counsel participation is facilitated, and prompt disposition of cases that will settle is encouraged." Id.

There are other important case management approaches, principles, and decisions that facilitated a timely and fair resolution here. These will be discussed below in the context of their specific application in this MDL.

B.    Application of Case Management Principles in this MDL

In this MDL, a motion for certification of a settlement class coincided with the Court's efforts to understand the litigants' needs and begin articulating goals and plans for managing the litigation. Specifically, on May 21, 2015, Plaintiffs Mark and Nicola Tulk sued Amtrak in this District. Case No. 2:15-cv-2849. On August 6, 2015, the Tulks filed a separate complaint requesting under Federal Rule of Civil Procedure 23, certification of a settlement class. Case No. 2:15-cv-4354. On February 2, 2016, under Rule 23(b)(1)(B), the Tulks moved to certify a mandatory, non-opt out settlement class.[5] The motion contended that the statutory cap on Amtrak's liability created a $295 million limited fund for aggregated damage awards arising from the derailment. It was submitted that certification would facilitate class-wide negotiations,

---

[5]  On February 2, 2016, the Tulks filed the motion to certify a settlement class on their individual docket, No. 2:15-cv-4354. On March 14, 2016, they re-filed the motion on the MDL docket, No. 2:15-md-2654.

prevent some plaintiffs from reducing or exhausting the limited funds before other plaintiffs could recover anything, and permit adequate notice to all potential class members. The Tulks proposed that their counsel be appointed class counsel.

At that juncture, the parties had not explored global settlement. Preliminary class certification was requested in order to negotiate a settlement. The nature and severity of the passengers' injuries and compensatory damages had not then been established. A rough estimation of the claimed damages, let alone a reasonable assessment, was not possible. And it was not known whether there were funds adequate to pay all claims.

The Court directed all parties to the MDL to respond to the motion for certification of a settlement class. Order, dated Feb. 8, 2016 (ECF 5). Parties from 80 of the 88 then-filed actions submitted a consolidated opposition to the motion, which streamlined the key issues. See MDL Best Practices at 7-8 (advising avoidance of duplicative efforts and conservation of judicial resources). The opposition maintained that civil MDL procedures should govern the litigation. The opposition submitted eight affidavits on behalf of nine claimants, who opposed class certification and strenuously expressed their desire to continue being represented by their chosen counsel. Plaintiff Lawrence J. Saia, as Personal Representative of the Estate of Giuseppe Piras, joined in the consolidated opposition and separately responded that the Piras family was "shocked and offended by the notion that substitute counsel could be forced upon them against their will." Resp. (ECF 9 at 3). Amtrak responded, deferring to the Court's decision as to whether certification was the most fair and efficient way to resolve the litigation.

Mindful that a "judge should endeavor to keep the MDL moving by promptly resolving pending motions," MDL Best Practices at 7, 16-20 (recognizing "the need to resolve class-certification issues as early as practicable"), and that a judge should promptly schedule an initial

conference with the parties, id. at 4, the Court scheduled an initial organizational conference. Order, dated Mar. 16, 2016 (ECF 35).  Counsel were encouraged to file written recommendations as to the structure and management of the MDL.  Submissions (ECF 40, 41, 45, 48-51, 53-55, 57-59, 61-64, 69).  A wide and divergent range of ideas was presented.

The initial organizational conference held on April 1, 2016—a three and a half hour in-person hearing—was an important event in the life of this MDL.  The Court and counsel explored alternative litigation management structures.  Everyone was given an opportunity to speak for as long as they chose to do so.  The Court repeatedly focused the discussions on what procedural mechanisms were best for achieving the larger public good of "everyone who was on that train."  See, e.g., Hr'g Tr., 66:6–68:15, dated Apr. 1, 2016 (ECF 105).  In sum, the conference initiated "discussions with counsel about the objectives for the MDL" and the steps envisioned for achieving them, and "set the tone for how counsel should collaborate in pursuing those objectives."  MDL Best Practices at 4.

During the conference on April 1, 2016, the dialogue between the Court and counsel was free and open, and all ideas were assessed on the merits.  This was important for so many reasons.  Most participants did not know me, their assigned judge.  They had no idea whether they should trust me.  Communication is most often enhanced when litigants and their counsel know (and trust) their judge.  But equally important, I was trying to establish that case management would be an open process, I wanted to hear what the lawyers thought, and I wanted them to understand that I would fully consider their thoughts before any final decisions were made.  Having the litigants submit their ideas in advance in writing, and having an open discussion about the value of their ideas for the MDL process, was a good way to introduce myself and establish a framework for an orderly and productive discussion.  Hopefully, the

procedure helped the parties and their counsel understand how I think, and that I endeavored to manage the litigation with a focus on the larger public good.  As judges can always improve on their ability to listen, I made my best effort to listen and understand.

And from my view, I kept myself open and accessible throughout the remainder of the litigation.  I facilitated and participated in conference calls too numerous to tally—regularly a few times every week and periodically daily, as required by the needs of this unique MDL. We discussed issues then presented and those expected to emerge in the future.  We planned cooperatively and collectively.  This experience has led to some firm convictions:  That free and open communication with the MDL judge was essential to the timely and just resolution of this MDL.  And that the MDL judge must listen, in addition to ruling.  An MDL judge must act as a fair-minded and effective administrator, not solely as an arbiter of disputes.  Granting attorneys the authority to act independently, while important, is not enough.  It is equally important that the MDL judge remain constantly involved and continuously available in the administration of the MDL, working closely with the leadership.

On the record during the initial conference on April 1, 2016, Amtrak unequivocally confirmed that it accepted responsibility for compensatory damages, without qualification.  Hr'g Tr., 13:4-14.  Amtrak's counsel, Mark Landman, Esq. of Landman, Corsi, Ballaine & Ford, P.C., was instrumental to a timely and fair disposition of this MDL.  Amtrak's early acknowledgment of liability, and Amtrak's agreement to tender $265 million upfront, rather than four or five years in the future (or perhaps at the end of discovery), allowed everyone to focus on settlement. There was no need to delay settlement discussions until the end of a time-consuming discovery period.  In fact, Amtrak reported at the conference remarkable success in having amicably resolved 19 cases directly with the passengers, without a lawsuit being filed, and reported "three

or four more cases" "fairly close to settling." Id., 14:10-12, 15:9-10.  Amtrak had been and persisted in diligently tracking down and proposing settlement to unresponsive, "silent" claimants.

Importantly, Amtrak facilitated the early collection of damages information even before the Court became involved in the MDL.  Amtrak partnered with certain Plaintiffs' counsel in developing a form damages questionnaire for personal injury and wrongful death claims.  The form was designed to collect information necessary to begin evaluating the claims, individually and in the aggregate.  Amtrak had distributed the questionnaire to counsel for each plaintiff who had filed an action arising out of the derailment.  Amtrak had requested that plaintiffs voluntarily complete and return the questionnaires.  At the conference, Amtrak reported that 34 claimants had returned completed questionnaires.  Deadlines were needed for completion of the questionnaires and production of expert reports and medical records.  However, no additional fact discovery was needed, and no discovery was needed at all as to Amtrak's liability.

In fact, use of a form damages questionnaire, also known as a "plaintiff's fact sheet," gave the Settlement Program vitality.  As is widely recognized, fact sheets are "[o]ne of the most useful and efficient initial mechanisms for obtaining individual plaintiff discovery."  MDL Best Practices at 14.  Similarly, requiring the collection of plaintiffs' medical records . . . is another straightforward way that MDL courts can encourage a robust exchange of key information at a relatively early stage."  Id. at 15.  Here, the damages questionnaire was  a court-embraced, standardized form that sought basic information about each plaintiff's claim—for example, what injury did the plaintiff sustain and what medical treatment was received or ongoing.  The questionnaire was necessary because the complaints did not provide sufficient information to determine the severity of the injuries.  Without completed questionnaires, there was no way to

determine if Amtrak's $295 million would be too much or too little.  Ultimately, the completed

questionnaires were crucially important to Amtrak's ability to decide early on to commit the full

$295 million, at a $265 million present value, to the Settlement Fund.

On April 6, 2016, the Court denied the motion for preliminary certification of a

settlement class.  Order & Mem., dated Apr. 6, 2016 (ECF 103, 104).  It was ruled that civil

MDL procedures were not only adequate, but likely superior methods to assess the claimed

damages, promote settlement discussions, and efficiently achieve a fair resolution for the victims

of this derailment, while preserving each Plaintiff's choice of counsel.  Moreover, the parties had

already made remarkable progress toward resolution.

On April 12, 2016, "[d]iscovery relating to liability and punitive damages [was] deferred

until further notice."  Order, dated Apr. 12, 2016 (ECF 107).  Plaintiffs were directed to serve

Amtrak by June 1, 2016, with completed damages questionnaires, which could be amended or

supplemented to account for ongoing treatment, if necessary.  Id.  By July 1, 2016, Plaintiffs

were directed to serve Amtrak with their expert reports on damages.  Id.

Furthermore, on April 12, 2016, the Court appointed temporary liaison counsel—Kline &

Specter, P.C., Saltz, Mongeluzzi, Barrett & Bendesky, P.C., and The Morelli Firm PLLC.  Order,

dated Apr. 12, 2016 (ECF 106).  The appointment was based on the substantial role that these

attorneys had "played in furthering the progress of the litigation thus far."  Id.  Liaison counsel

were directed to "coordinate and facilitate communications between and among the Court,

plaintiffs' counsel, and defense counsel, as well as assist in the orderly management of these

proceedings."  Id.  No commitment was made to compensate liaison counsel; however, they were

asked to keep track of expenses and hours spent in discharging their assigned duties.  Id.  In

addition, the Court announced its intention to appoint a Plaintiffs' Management Committee

("PMC") in the immediate future.  Id.  By April 26, 2016, the parties were permitted to submit

applications and nominations for membership of the PMC.  Id.

The initial conference on April 1, 2016, was important for another reason—it was a good

opportunity to evaluate the lawyers for potential appointment and participation as members of

the Plaintiffs' Management Committee.  The room was filled with fine lawyers—all outstanding

and accomplished.  Nonetheless, in many instances, the skills and ability to lead as well as

effectively collaborate with other lawyers in the room became readily apparent.  Determining the

appropriate leadership structure and selecting the right lawyers to fill the positions on the PMC

was one of the most important case management decisions made:

> In an MDL action with many parties with separate counsel, the transferee judge
> should establish a leadership structure for the plaintiffs . . . to promote the
> effective management of the litigation.
>
> The transferee judge should assess the needs of the litigation in establishing an
> appropriate leadership structure.

MDL Best Practices at 34.  "The goal is to ensure that litigation will be managed efficiently and

effectively without jeopardizing fairness to the parties."  Id.

Mindful that "[c]ommon disaster litigation . . . often involves the greatest diversity of

interests found in MDLs," MDL Best Practices at 36, it was concluded that a single leadership

committee was adequate to represent the competing interests.  Here, the plaintiffs included many

injured individuals and other individuals who suffered the loss of a family member.  However,

during the conference on April 1, 2016, there was a general consensus that collection of damages

information and settlement was a principal priority.  Some counsel suggested that a single

committee of Plaintiffs' counsel, acting on behalf of all Plaintiffs, should take the lead in

facilitating assessments of damages and communications on behalf of all Plaintiffs with Amtrak

and the Court.  Some counsel expressed concern that each individual's damages should be

disclosed only to Amtrak and the Court, and administrative costs should be kept to a minimum. Others opposed any administrative structure. After considering all perspectives, the Court decided upon the preliminary administrative structure. As we moved forward, the Court actively partnered with this nascent organizational structure.

On May 24, 2016, the Court appointed counsel to serve on the Plaintiffs' Management Committee. Order, dated May 24, 2016 (ECF 121). Seven members were appointed, of whom Thomas R. Kline, Esq. of Kline & Specter, P.C. was appointed Chair of the PMC. [6] Id. The PMC then assumed liaison counsels' duties to coordinate and facilitate communications, and the appointment of liaison counsel came to an end. Id. In addition, the PMC was charged with ensuring compliance with deadlines, providing recommendations on the structure and process of the litigation, and providing the Court with input as to important issues as needed. Order, dated Apr. 12, 2016 (ECF 106). No commitment was made to compensate the PMC; however, they were asked to keep track of expenses and hours spent in discharging their duties.

On June 29, 2016, as amended on July 22, 2016 (ECF 124, 132), the PMC presented to the Court a plan for the sharing of damages information between Amtrak and the PMC. Orders dated Apr. 12, 2016 (ECF 106, 107). Some Plaintiffs expressed reservations about the plan, primarily based on concerns that disclosure of confidential damages information might favor parties whose counsel were members of the PMC. Objections (ECF 125, 126, 127, 129, 131, 135). The objections were resolved without a formal ruling: the PMC withdrew the request.

---

[6] Seven individual attorneys from the plaintiffs' bar were appointed to serve on the PMC, as follows: one representative from Baum, Hedlund, Aristei & Goldman, P.C.; Kenneth M. Rothweiler, or designee, of Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C.; Judith A. Livingston, or designee, of Kramer, Dillof, Livingston & Moore; one representative from Stein Mitchell Cipollone Beato & Missner; Robert J. Mongeluzzi, or designee, of Slatz, Mongeluzzi, Barrett & Bendesky, P.C.; Thomas R. Kline, or designee, of Kline & Specter, P.C.; and Benedict P. Morelli, or designee, of Morelli Law Firm, PLLC.

Plaintiffs were directed to deliver to the Court, no later than September 9, 2016, copies of their responses to the damages questionnaire and their expert reports on damages, without additional attachments or supporting medical record documentation.  Orders, dated respectively Aug. 17, 2016, and Aug. 22, 2016 (ECF 134, 136).  The damages information would remain confidential and not be posted electronically on the Court's docket.  Id.  Also as directed by the Court, by September 15, 2016, the PMC met and conferred with Amtrak regarding the status of the litigation.  Id.  As further directed, by October 3, 2016, the PMC presented to the Court recommendations for efficiently ordering and structuring the litigation through its conclusion. Id.  In fact, the Court, Amtrak, and the PMC conferred on numerous occasions in late September and early October 2016, and extensively discussed the proposed CMO.   Amendments were made with the agreement of all.  Through this dialogue and teamwork, the administrative structure of the MDL was fine-tuned, and ultimately was memorialized in the present CMO.

The Plaintiffs' Management Committee provided many innovative and effective ideas for administering the MDL.  They cooperated at all times with the Court, with generosity of time, attention, and effort to streamline processes for resolution of the litigation.  They did an excellent job of explaining the Settlement Program to other Plaintiffs' counsel.  Members of the PMC always demonstrated concern for the collective good of the Plaintiffs as a whole—they admirably separated their individual cases and interests from the more comprehensive administrative questions and goals.  The PMC and Amtrak also worked well together as equal partners, not adversaries.  They communicated honestly, candidly, and openly with this Court. And the PMC did not seek common benefit funds—they did all of this for free, without charge for what amounted in some instances to 1000–1500 hours of services plus substantial expenses.

They are to be commended for their public-spirited efforts to ensure that Plaintiffs received as much money as possible, as soon as practicable.

In fact, the PMC—all recognized leaders of the plaintiffs' bar who are highly skilled and experienced in complex personal injury litigation—cooperated with counsel for all of the Plaintiffs to achieve the most expeditious and the least expensive resolution of the MDL. Each of them did so in order to put as much money, as soon as practicable, into the hands of the injured victims of the derailment. The PMC and Plaintiffs' counsel commendably advanced the common benefit of the litigants and the Court. This minimized the amount of work and the time needed to reach a fair and just disposition of each and every claim. In sum, each and every member of the PMC went well beyond their professional duties as advocates and officers of the court—with dedication, they acted as fair-minded, public-spirited citizens.

The Settlement Program provided for the appointment of "Masters," who were charged with reviewing the submissions and evidence supporting the compensatory damages claimed by each Participating Plaintiff. CMO ¶¶ 12-13, 15. See Fed. R. Civ. P. 53(a)(1)(A) (authorizing an appointment of masters with the parties' consent). Here, the use of the Masters was critical in expediting the time-consuming process of fairly and accurately evaluating each and every Plaintiff's individual damages. See MDL Best Practices at 6-7 (recognizing that "special masters may be critical to avoiding delays in addressing time-consuming matters").

The Court selected two highly qualified professionals—the Honorable Diane M. Welsh (Ret.) and the Honorable William J. Manfredi (Ret.)—to serve as Masters under the Settlement Program, performing the duties and functions consented to by the parties, as approved by the Court in the CMO. Order, dated Dec. 20, 2016 (ECF 156). Based on working with each of the Masters on other previous matters, I had great confidence in their judgment, wisdom, and

willingness to communicate honestly with me.  The appointment of accomplished and

independent Masters was important to the success of this MDL.  The parties were given notice

and an opportunity to be heard as to the selection.  Order, dated Feb. 6, 2017 (ECF 168).

Because no party objected to appointment of the Judges, and there were no actual or apparent

conflicts of interest presented by either Judge's service, Judge Welsh and Judge Manfredi were

appointed as Masters.  Order, dated Mar. 1, 2017 (ECF 171).  In fact, local counsel as well as

counsel for parties from the other jurisdictions uniformly expressed their high regard for the

Judge Welsh's and Judge Manfredi's qualifications, appointment, and services.

The Masters, both fiercely independent professionals, proposed to the Court that they

work jointly because together they would be able to more fully consider each Plaintiff's

damages.  As a team, they would also be able to critically vet their conclusions with one another

and arrive at a more fully reasoned consensus as to each and every claim.  Accepting this

recommendation, the Court directed that the Masters perform their work jointly because that

method would permit the Masters to test the accuracy and develop the objectivity of their

recommendations to the Court.  And the Court did so even though that method appeared more

costly.  Ultimately, the Plaintiffs were better-served by this method, and the administrative costs

of the Program were kept at a minimum.

The Masters, with the utmost professional objectivity and diligence, reviewed the

submissions and evidence supporting the compensatory damages claimed by each and every

Participating Plaintiff.  The Masters met with Plaintiffs and conducted hearings.  Plaintiffs were

given as much time with the Masters as they requested.  The Masters devoted substantial time to

collecting, organizing, and evaluating the evidence for the many individual claims.  As to each

Participating Plaintiff, the Masters recommended to the Court findings of fact and an award of compensatory damages.

While the Masters were performing their services, the Court independently considered the submissions and evidence supporting the compensatory damages claimed by each and every Participating Plaintiff.  Every piece and page of damages information for each and every Plaintiff was fully considered.  The Court reached its own preliminary opinions.  Upon receipt of the Masters' reports and recommendations for all of the Participating Plaintiffs, I met with the Masters, and we jointly reviewed the submissions and claims.  We discussed each and every claim in depth, and we reached a common understanding.

Masters Welsh and Manfredi also acted as dedicated, public-spirited citizens for the common welfare of the passengers—they agreed to be compensated for their services at rates markedly lower that their usual and customary fees for similar matters.  Their generosity saved substantial costs, which ultimately increased the awards for Plaintiffs, and their well-considered recommendations enhanced the accuracy of the final awards.

Amtrak submitted a report setting forth previous payments to passengers for medical and rehabilitative care and for advances up to $10,000.00.  See CMO ¶ 16.  Otherwise, Amtrak did not submit evidence and has not taken part in any hearings or other proceedings before the Masters.  Amtrak's primary role has been to facilitate and consummate fair and expeditious settlements of individual claims.  Again, Amtrak's early acceptance of responsibility and its assiduous efforts to settle have contributed substantially to the remarkably prompt resolution of the MDL.

After meeting with the Masters, the Court independently performed a substantive and comprehensive inquiry into the consistency, uniformity, and fairness of the Masters'

recommendations as to each Participating Plaintiff.  See CMO ¶ 19.  The Court reviewed *de novo*
the Masters' recommended findings of fact and awards of compensatory damages based on the
evidence considered by the Masters in making their recommendations.  As it turned out, the
Court's and the Masters' respective independent judgments as to the measure of damages were
very close.  Ultimately, the Court adjudicated each Participating Plaintiff's final award.  See
CMO ¶¶ 20-23.  The Court decreased *pro rata* each Participating Plaintiff's recovery of
compensatory damages, so that the aggregated final awards equaled the Settlement Fund.  Id. ¶¶
22.C.  On June 30, 2017, the Court notified each Participating Plaintiff of its findings concerning
the (1) the total compensatory damages actually suffered by the Participating Plaintiff; (2) the
adjusted compensatory damages for the Participating Plaintiff, after subtraction of any prior
payments by Amtrak for medical and rehabilitative care, and any prior advances by Amtrak, and
(3) the final award for the Participating Plaintiff.  Id. ¶¶ 20-23.

On July 31, 2017, after the accountants completed their work, the Court distributed to
Participating Plaintiffs their final awards.  CMO ¶ 23.  The final awards, which completely
depleted the settlement fund, included each Plaintiff's *pro rata* share of the Settlement Fund for
compensatory damages, together with each Plaintiff's *pro rata* share of the earnings from
investment of the Settlement Fund and each Plaintiff's *pro rata* share of the residual, unspent
administrative funds.[7]

---

[7]  Initially, a portion of Settlement Fund was deposited in an interest-bearing account, which was used to
pay administrative fees and expenses.  The actual administrative costs did not entirely deplete the
reserved funds.  Each Participating Plaintiff's final award also returns his or her *pro rata* share of the
residue of the administrative fund.

II.    GIVEN THIS MDL'S UNIQUE SETTING, THE SETTLEMENT PROGRAM
ACHIEVED FAIR, REASONABLE, AND ADEQUATE COMPENSATION
CONSISTENT WITH THE EQUAL TREATMENT OF ALL CLAIMANTS

The Settlement Program is the product of the parties' consent.  Ordinarily, settlement of a

dispute "is solely in the hands of the parties," and "the court need not and should not get

involved."  Caplan v. Fellheimer Eichen Braverman & Kaskey, 68 F.3d 828, 835 (3d Cir. 1995)

(citation and internal quotation marks omitted).  And generally, "[t]here are only certain

designated types of suits, for instance . . . class actions, . . . where settlement of the suit requires

court approval."  Id.  Although this MDL was not certified as a class action, the Court actively

supervised and directed the Settlement Program.  The Court did so in order to protect all

potential claimants who might have an interest in the litigation or whose rights might be curtailed

by the settlement, but who were not yet parties to the settlement agreement.  In this exceptional

situation, and given Amtrak's limited liability, the fairness, reasonableness, and adequacy of the

settlement will be considered, by analogy, under the factors set forth by our Court of Appeals for

evaluating a proposed settlement of a class action:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction
> of the class to the settlement; (3) the stage of the proceedings and the amount of
> discovery completed; (4) the risks of establishing liability; (5) the risks of
> establishing damages; (6) the risks of maintaining the class action through the
> trial; (7) the ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best possible
> recovery; and (9) the range of reasonableness of the settlement fund to a possible
> recovery in light of all the attendant risks of litigation.

In re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 437 (3d Cir.), cert.

denied, 137 S. Ct. 591 (2016) (quoting Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975)).

"The first factor captures the probable costs, in both time and money, of continued

litigation."  Nat'l Football, 821 F.3d at 437 (quoting In re Warfarin Sodium Antitrust Litig., 391

F.3d 516, 535-36 (3d Cir. 2004) (quoting In re Cendant Corp. Litig., 264 F.3d 201, 233 (3d Cir.

2001)) (internal quotation marks omitted).  The probable costs of continued litigation in the

MDL were significant.  The sheer number of plaintiffs increased the complexity of the litigation.

The litigation would likely be protracted, requiring an extended period for discovery.  Complex

and perhaps novel legal issues were raised by the claims for punitive damages.  Among other

allegations requiring expert review and opinion evidence, that Amtrak should be punished for not

installing a Positive Train Control system would have been costly both in time and money to

prosecute or defend.  Extensive pretrial and post-trial motions and appeals would not only further

prolong the litigation, but also reduce the resources of the litigants and the value of any recovery.

Importantly, continued litigation in the MDL presented a clear danger of injustice.

Amtrak cannot be adjudged liable for more than the statutory limit that may be paid for all

aggregated claims, including claims for punitive damages, arising from the derailment.  It was

likely that Amtrak's ability to pay would be exhausted by claims that were adjudicated first,

leaving many equally deserving, and perhaps more seriously injured, claimants with no recovery

at all.  In fact, the Court tallied the total compensatory damages actually suffered by the

passengers and their families to approximate over $500 million—about twice the present value

of the available settlement funds.

"The second Girsh factor attempts to gauge whether members of the class support the

settlement." Nat'l Football, 821 F.3d at 438 (quoting Warfarin, 391 F.3d at 536) (quoting In re

Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 318 (3d Cir. 1998))

(internal quotation marks omitted).  As noted above, there were 245 passengers aboard when

Amtrak Train 188 derailed.  Amtrak successfully engaged all but two passengers in the

settlement.  Those two, residing in India, did not respond to Amtrak's repeated efforts to contact

them.  One hundred percent (100 %) of the 159 total participants in the Settlement Program—

composed of passengers and their spouses who asserted loss of consortium—elected to settle directly with Amtrak or by participation in the Program.  Participation was not mandatory. Plaintiffs could elect to forego participation and instead, pursue separate trials.  CMO ¶¶ 6, 26-29.  However, none did so.  In sum, support for the settlement was virtually unanimous.

The third Girsh factor—the stage of the proceedings and amount of discovery conducted—weighs in favor of the settlement.  This factor "captures the degree of case development that class counsel [had] accomplished prior to settlement.  Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating."  Nat'l Football, 821 F.3d at 438-39 (quoting Warfarin, 391 F.3d at 537) (quoting Cendant, 264 F.3d at 235)) (internal quotation marks omitted) (alteration in original). Importantly, "formal discovery is not a requirement for the third *Girsh* factor."  Id. at 439.  What matters is not the amount or type of discovery pursued by counsel, but "whether they had developed enough information about the case to appreciate sufficiently the value of the claims." Id.  Furthermore, requiring formal discovery before settlement "would take a valuable bargaining chip—the costs of formal discovery itself—off the table during negotiations," which could deter early settlements.  Id.

Instead of formal discovery, the parties chose to submit summaries of their damages and supporting medical records and expert reports.  In addition, the National Transportation Safety Board's ("NTSB") report provided a comprehensive and informative analysis of the derailment. In some cases, such as those here, "informal discovery will be enough for class counsel to assess the value of the class' claims and negotiate a settlement that provides fair compensation."  Nat'l Football, 821 F.3d at 436-37 (citing In re Processed Egg Prods. Antitrust Litig., 284 F.R.D. 249, 267 (E.D. Pa. 2012) ("although no formal discovery was conducted  . . . , informal discovery,

including, *inter alia*, independently investigating the merits . . . enabled counsel to have sufficient background in the facts")) (alteration added).  The parties' summaries in response to the damages questionnaire and their expert reports, as well as the NTSB's report, eliminated the need for costly and protracted formal discovery, and prevented duplicative discovery. Depositions were not necessary.  Informal discovery was adequate to allow the parties, the Masters, and the Court to assess the merits and value of the claims, thereby conserving the resources of all.

The Settlement Program was established without the need for the parties to engage in extensive and costly discovery.  Again, informal discovery combined with the NTSB Report was adequate to assess the true value of the claims.  And there was no need for liability discovery because Amtrak unequivocally accepted full responsibility for compensatory damages. Furthermore, the PMC and Amtrak agreed to focus on resolving the compensatory damages, putting aside for later consideration all claims for punitive damages.  These events contributed substantially to the parties' ability and willingness to amicably resolve the value of the damages with dispatch.  In sum, the litigants on both sides had an adequate appreciation of the merits of the litigation before they negotiated a settlement.

"The fourth and fifth <u>Girsh</u> factors—the risks of establishing liability and damages— deserve minimal consideration.  These factors "survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement."  <u>Nat'l Football</u>, 821 F.3d at 439 (quoting <u>Prudential</u>, 148 F.3d at 319) (internal quotation marks omitted).

Here, there was no risk of establishing Amtrak's liability.  Amtrak accepted liability. And there was little or no risk of establishing the claimed compensatory damages.  Issues of

causation were tragically straightforward. Plaintiffs would have faced serious challenges and expense in establishing Amtrak's liability for punitive damages. However, some counsel for Plaintiffs were willing to defer the punitive damage claims, in exchange for an expeditious and equitable share of the settlement funds. The Court ultimately ended the discussion by ordering deferral of punitive damage claims. Deferral was not only fair, but an intelligent choice. Without a settlement program, some litigants would likely never have any trial on damages— neither compensatory nor punitive. The question was not whether Plaintiffs could successfully recover a full damage verdict, but rather whether there would be any funds available to pay a potential verdict should the MDL litigation continue to separate trials. And this was precisely why a settlement program was needed—to ensure the fair and proportional treatment of every claim. My duty was to all passengers, not just those who had filed suit. Participants on conference calls were repeatedly told that final payments would not be made until each and every passenger was taken into account. Throughout this litigation, Amtrak aided the discharge of that duty by tracking down "silent" passengers and encouraging them to file lawsuits or amicably resolve their claims as a private matter directly with Amtrak. In sum, the Settlement Program was the most fair and reasonable option—presenting the greatest likelihood of a successful recovery for the greatest number of claimants.

The sixth Girsh factor—the risks of maintaining the class action through the trial is inapposite. The parties preferred the Settlement Program in lieu of a class action. Moreover, "[i]n a settlement class, this factor becomes essentially 'toothless' because a district court need not inquire whether the case, if tried, would present intractable management problem[s], . . . for the proposal is that there be no trial." Nat'l Football, 821 F.3d at 440 (quoting Prudential, 148

F.3d at 321) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997)) (internal quotation marks omitted).

The seventh Girsh factor—the ability of defendants to withstand a greater judgment—compels approval of the settlement here.  Amtrak cannot pay any more than the statutorily prescribed maximum limit for the aggregated claims arising out of the derailment.  And Congress has not increased that monetary limit to fully pay every compensable claim.

The eighth and ninth Girsh factors—the range of reasonableness of the settlement in light of the best possible recovery and all attendant risks of litigation—weigh heavily in favor of the settlement.  In evaluating these factors, "we ask 'whether the settlement represents a good value for a weak case or a poor value for a strong case.'"  Nat'l Football, 821 F.3d at 440 (quoting Warfarin, 391 F.3d at 538).  "The factors test two sides of the same coin:  reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial."  Id. (quoting Warfarin, 391 F.3d at 538) (internal quotation marks omitted).  "[T]he present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement."  Id. (quoting Prudential, 148 F.3d at 322) (internal quotation marks omitted).

If Plaintiffs were successful at trial, it is fairly certain that they would be entitled to substantial compensatory damages awards, likely aggregating more than $500 million.  However, it is equally apparent that the litigation risks inherent in pressing forward with separate trials could eliminate any monetary recovery for some, if not many claimants.  And there was a good chance that separate trials would create risks of inconsistent or varying adjudications that would establish incompatible standards of conduct for Amtrak, or adjudications that, as a practical matter, would substantially impair or impede the ability of non-party claimants to

protect their own interests. See Fed. R. Civ. P. 23(b)(1)(A), 23(b)(1)(B). Given all attendant risks of litigating separate trials, compensation under the Settlement Program represents good value—regardless of the strengths or weaknesses of an individual claim.

The final awards distributed under the Settlement Program represent "a fair deal" for claimants, "when compared with a risk-adjusted estimate of the value of plaintiffs' claims." Natl'l Football, 821 F.3d at 440. Amtrak and the PMC on behalf of all Plaintiffs negotiated at arm's length to arrive at a global resolution—the Settlement Program— that was designed to afford all injured or damaged claimants an equitable share of the funds available under Amtrak's statutorily limited liability. In addition, the Program produced remarkable efficiency and cost benefits for both the parties and the courts. As a consequence of the efforts of all involved in the MDL litigation, the administrative expenses and fees for the Settlement Program are a minimum amount—totaling at final conclusion no more than $1,110,382.95, which is 0.00418 %[8] of the Settlement Fund. In addition, investment of the Settlement Fund added over $570,214.64[9] extra funds for *pro rata* distribution in the final award distributed to each Participating Plaintiff. Again, Amtrak cannot be adjudged liable for more than the $295 million statutory limit that may be paid for all aggregated claims, including claims for punitive damages, arising from the derailment. The Program created a Fund that provides the best possible recovery—that is, the present value of the maximum statutory limit of Amtrak's liability, $265 million, which has been equitably and expeditiously distributed to all claimants.

In conclusion, it was rewarding to work with Amtrak and the Plaintiffs' Management Committee. Mark Landman for Amtrak and Tom Kline and Chip Becker of the PMC merit

---

[8] Administrative costs ($1,110,382.95) ÷ $265,570,214.76 [Settlement Fund ($265,000,000) + earnings on investments ($570,214.64)] = .00418.
[9] The efforts and advice of the Settlement Administrator, Wayne Geisser of Marcum LLP, were instrumental in maximizing the return on the investment of the Settlement Fund.

special recognition.  Their leadership was exceptional.  Their labors, vision, and spirit of acting

in the best interests of the passengers and their families largely made this MDL a success.  At all

times, Amtrak and the PMC minimized costs, and worked together toward realizing shared goals

and objectives as quickly as practicable.  They listened, critically evaluated matters, and

compromised when needed.  They were persuaded by reason, and they were not bound or

blinded by an institutional litigation perspective of counsel for plaintiff or for counsel for

defendant.  By adhering to basic case management truths, the parties enhanced the overall quality

of the litigation process, and hopefully thereby enhanced public confidence in the court as an

institution.  They truly helped the Court reach the goal of delivering the greatest measure of

justice possible under the circumstances, which was my objective from the inception of this

MDL.  And that was done by all participants in the MDL in a timely manner.  My opportunity to

contribute to the resolution of the MDL has been a unique, exceptionally rewarding professional

privilege.  My thanks to all.


                                        BY THE COURT:

                                        /s/ Legrome D. Davis

                                        Legrome D. Davis, J.